La Juez Asociada Señora Rodríguez Rodríguez
emitió la opi-nión del Tribunal.
En esta ocasión examinamos la validez de varios artícu-los de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. secs. 6152-6166g, a la luz de las doctrinas constitucionales de vaguedad y amplitud excesiva, así como del principio de legalidad establecido en el Código Penal. Veamos los he-chos que originan este recurso.
i — i
El 9 de febrero de 2006, el Ministerio Público presentó una denuncia contra APS Healthcare of Puerto Rico, Inc. (APS) por violación a los Artículos 3.06(a) y 15.08(a) de la *372 Ley de Salud Mental de Puerto Rico, Ley Núm. 408 de 2 de octubre de 2000 (24 L.P.R.A. secs. 6154e(a) y 6166g(a), de-lito clasificado como menos grave. La denuncia enmenda-da(1) contra la corporación, expone:
El referido acusado APS Healthcare of Puerto Rico Inc. allá en o para el 10 al 11 de febrero de 2005, en Bayamón, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Pri-mera Instancia de Bayamón, ilegalmente, violó la disposición del Art. 3.06(a) de la Ley 408 al negar acceso a un servicio de emergencia psiqui[á] trica a Marcos Rosario Meléndez quien tenía derecho a ello por su condición de salud mental y porque era de conocimiento del acusado, a través de sus funcionarios de las ideas de daño a sí mismo o suicidas que manifestaba Marcos Rosario Meléndez, ni ofrecer los servicios dentro de los cinco días naturales que dispone el artículo. Ocurriendo la muerte de Marcos Rosario Meléndez por suicidio el 18 de fe-brero de 2005. Addendum de la Petición de certiorari, pág. 8.
Por estos mismos hechos, el Ministerio Público presentó también una denuncia contra la Sra. Sonia Torres Ríos (se-ñora Torres), trabajadora social clínica empleada de APS Healthcare of Puerto Rico Inc.,(2) de acuerdo con el Artículo 6.01 de la Ley de Salud Mental, 24 L.P.R.A. see. 6157. La *373 señora Torres atendió al joven Marcos Rosario Meléndez el 11 de febrero de 2005, alegadamente realizando una eva-luación deficiente y citándolo con un consejero de sustan-cias controladas y con un psiquiatra al cabo de trece y veinte días de solicitar los servicios de salud mental, respectivamente.
En la vista de causa para arresto mediante la Regla 6 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, se encontró causa para el arresto contra APS y se determinó “no causa” con relación a la señora Torres.
Inconforme con el dictamen, y por tratarse de un delito menos grave, la peticionaria APS presentó una Moción de Desestimación, al amparo de la Regla 64(a), (b) y (p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. En cuanto a sus incisos (a) y (b), argüyó que la acusación no imputaba delito o que el tribunal no tenía jurisdicción para encausar a la peticionaria, puesto que el estatuto, cuya violación se le imputaba, adolecía de vaguedad y amplitud excesiva, además de contravenir el principio de legalidad estatuido en el Código Penal. Expresó también que el Ministerio Pú-blico había fallado en cumplir con su carga probatoria en etapa de la Regla 6, ya que había ausencia total de prueba, en cuanto a varios elementos del delito, incluyendo prueba de que el Sr. Marcos Rosario Meléndez se encontrara en un estado de “emergencia psiquiátrica” y el grado de intención necesaria para cometer el delito, por lo que procedía la desestimación de la denuncia según la Regla 64(p), al no encontrarse causa conforme a derecho.
La discusión de ambos planteamientos se bifurcó, cele-brándose la vista argumentativa en cuanto al plantea-miento mediante la Regla 64(p) el 3 de abril de 2006 y la vista argumentativa sobre los planteamientos constitucio-nales el 11 de abril de 2006. En ambos procedimientos se declararon “no ha lugar” las mociones presentadas por la peticionaria.
*374 Aún inconforme con dicho proceder, la peticionaria APS acudió al Tribunal de Apelaciones mediante un recurso de certiorari el 3 de mayo de 2006, para recrear esencialmente los mismos argumentos que esgrimió en el Tribunal de Pri-mera Instancia. El Tribunal de Apelaciones expidió el auto y confirmó las resoluciones recurridas. Entendió, en primer lugar, que no aplicaba en este caso la doctrina de am-plitud excesiva, pues dicha doctrina se reserva para cuando la aplicación de una ley conlleva un efecto neutra-lizador (chilling effect) en el ejercicio de los derechos cons-titucionales fundamentales de los ciudadanos, como lo son la libertad de expresión y asociación. No estando en juego esos derechos en este caso, no aplicaba dicha doctrina, por lo que el ataque constitucional a la ley no podía ser de su faz, sino sólo en su aplicación a APS.
En cuanto al planteamiento de vaguedad, entendió en síntesis que “el Artículo 3.06 claramente alude a la obliga-ción legal de los proveedores directos e indirectos de brin-dar sus servicios en los plazos estatuidos”(3) por lo que la legislación no adolecía de vaguedad y se trataba entonces de un delito de omisión pura que se configuraba cuando el actor, en este caso APS, incumplía con su obligación de “brindar los servicios en los plazos estatuidos”. Apéndice de la Petición de certiorari, pág. 18. Asimismo indicó, en cuanto a la alegada ausencia total de prueba en la vista de Regla 6, que el Ministerio Público cumplió con su deber de presentar una scintilla de evidencia sobre todos los ele-mentos del delito por lo que tampoco procedía dicho planteamiento.
La peticionaria APS entonces acude ante este Foro pre-sentando los errores siguientes:
Erró el Honorable Tribunal de Apelaciones al no desestimar bajo la Regla 64(a) y (b) de Procedimiento Criminal la denun-cia de epígrafe y al no declarar la inconstitucionalidad del ar- *375 tículo penal 15.08 y el artículo 3.06 de la Ley de Salud Mental, Ley Núm. 408 de 2 de octubre de 2000, por adolecer de falta de notificación adecuada bajo el principio de vaguedad.
Erró el Honorable Tribunal de Apelaciones al no desestimar bajo la Regla 64(a) y (b) de Procedimiento Criminal la denun-cia de epígrafe y al no declarar la inconstitucionalidad del ar-tículo penal 15.08 y el artículo 3.06 de la Ley de Salud Mental, Ley Núm. 408 de 2 de octubre de 2000, por adolecer de ampli-tud excesiva.
Erró el Honorable Tribunal de Apelaciones al no desestimar los cargos contra la corporación acusada, toda vez que a la trabajadora social que atendió y refirió al paciente no se le halló causa.
Erró el Honorable Tribunal de Apelaciones al denegar la soli-citud de desestimación bajo la Regla 64(p) pues no se declaró causa probable conforme a la ley y a derecho. Petición de cer-tiorari, pág. 8.
El 11 de octubre de 2007 denegamos la expedición del recurso de certiorari. El 30 de noviembre de 2007 denega-mos reconsiderar nuestra decisión de no expedir el recurso por estar igualmente dividido el Tribunal. El 18 de enero de 2008, luego de una segunda moción de reconsideración, decidimos reconsiderar y expedir el auto solicitado. Con el beneficio de la comparecencia de las partes en el litigio procedemos a resolver.
II
Por estar íntimamente relacionados, discutiremos los primeros dos señalamientos de error conjuntamente.
A. Una ley o un reglamento adolece de amplitud excesiva cuando, a pesar de que su objetivo es castigar o prohibir una expresión no protegida constitucionalmente, su redacción o interpretación tiene como efecto proscribir expresiones constitucionalmente protegidas por la cláusula de la libertad de expresión o asociación. U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153, 161 (1993). En este contexto, la doctrina de amplitud excesiva permite al reclamante el ataque de una ley de su faz, no necesariamente en su aplicación, y *376 es una excepción a la regla de que “una persona no puede impugnar un estatuto o una ordenanza municipal ale-gando que podría ser inconstitucional de aplicarse en cir-cunstancias distintas a las del caso que está en el tribunal”. Vélez v. Municipio de Toa Baja, 109 D.P.R. 369, 378 (1980).
El objetivo es evitar que la aplicación de la ley o el re-glamento produzca el llamado efecto neutralizador o “chilling effect” que suponen las leyes que castigan tanto la expresión protegida constitucionalmente como aquella no protegida, puesto que la sola existencia del estatuto puede causar que otras personas que no están ante el tribunal se abstengan, de hacer alguna expresión protegida constitucionalmente. Véase Vives Vázquez v. Tribunal Superior, 101 D.P.R. 139, 146 (1973). Tanto en esta jurisdic-ción como en la federal, la aplicación de esta doctrina se ha limitado al reclamo de derechos protegidos por la cláusula de libertad de expresión o asociación. Véanse: Disidente Univ. de P.R. v. Depto. de Estado, 145 D.P.R. 689 (1998); Pueblo v. Hernández Colón, 118 D.P.R. 891, 899 (1987). En la jurisdicción federal, véase United States v. Raines, 362 U.S. 17 (1960). Así también, hemos resuelto que la ampli-tud excesiva ha de ser sustancial en relación con el alcance legítimo que la medida pueda tener. Pueblo v. Hernández Colón, supra, pág. 899.
Así, pues, en este caso la peticionaria alega que existe una amplitud excesiva de la ley en dos instancias, por lo que es inconstitucional. En primer lugar, la peticionaria APS alega que la aplicación de la ley incide sobre “la pro-fesión de la salud en todas sus disciplinas” puesto que el artículo que se le imputa es “arbitrario”, ya que no se sabe lo que prohíbe, creando un efecto neutralizador o “chilling efect” en la práctica de los profesionales de la salud, lo que la hace inconstitucional. En segundo lugar, alega que la redacción de la disposición penal de la ley de salud mental peca de amplitud excesiva, ya que ésta no denota juicio valorativo del legislador de cuál es la conducta punible.
*377 Como establecimos anteriormente, la doctrina de amplitud excesiva protege los derechos fundamentales de libertad de expresión y asociación. La Ley de Salud Mental de Puerto Rico no incluye disposiciones que regulen o reglamenten los derechos protegidos por las cláusulas mencionadas. La Ley Núm. 408 de 2 de octubre de 2000, conocida como la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. see. 6152 et seq., es un esquema regulador de los servicios de salud mental que se brindan a los solicitantes médico-indigentes por parte de proveedores directos e indirectos del sector privado. Su propósito principal es “establecer las necesidades de prevención, tratamiento, recuperación y rehabilitación en salud mental; crear las ‘Cartas de Derecho’ para adultos y menores que reciben servicios de salud mental; uniformar lo relativo a los procedimientos relacionados con estos derechos; establecer los principios básicos de los niveles de cuidado en el ofrecimiento de servicios de salud mental ... y establecer penalidades”. Exposición de Motivos de la Ley Núm. 408, supra, 2000 (Parte 3) Leyes de Puerto Rico 2664-2665. No cabe hablar de la doctrina de amplitud excesiva en este contexto, puesto que ni el objetivo ni el efecto de la aplicación de la ley es regular la diseminación o expresión de ideas. Se trata, pues, de una legislación social cuyo solo objetivo es la regulación de servicios de salud mental, con el firme propósito de la Asamblea Legislativa de garantizar que los ciudadanos médico-indigentes de nuestro país tuviesen acceso a los servicios de salud mental de calidad, según sus respectivas condiciones. Por lo tanto, la doctrina de amplitud excesiva es inaplicable en ambas instancias.
B. Discutiremos, entonces, los planteamientos de la peticionaria a la luz de la doctrina de vaguedad.
La doctrina de vaguedad es un corolario del debido proceso de ley que prohíbe la aplicación contra una persona de una ley o un reglamento cuyos términos *378 no revelen clara y adecuadamente cuál es la conducta prohibida. Pueblo v. Hernández Colón, supra, pág. 901. He-mos establecido que una ley adolece de vaguedad si: (1) una persona de inteligencia promedio no queda debida-mente advertida del acto u omisión que el estatuto pre-tende prohibir y penalizar; (2) se presta a la aplicación arbitraria y discriminatoria, y (3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución. Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 240 (1988). Esta doctrina es especialmente aplicable al análisis de estatutos penales. Véase Pueblo v. Mantilla, 71 D.P.R. 36, 40 (1950).
Por otro lado, hemos expresado en innumerables ocasiones que todas las leyes, aun las más claras, requieren interpretación. Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 538 (1999). Por esta razón, la doctrina de vaguedad en forma alguna implica que los estatutos penales deban es-tar redactados de tal forma que no necesiten interpretación judicial. De hecho, un ataque constitucional a una ley según la doctrina de vaguedad implica que se ha realizado un análisis adecuado del texto de la ley a la luz del significado jurídico de las palabras, utilizando precedentes judiciales que hubiesen interpretado el texto y que, aún luego de dicho análisis, una persona de inteligencia promedio no queda debidamente advertida de la conducta proscrita, el estatuto infringe derechos fundamentales o se presta a la aplicación arbitraria y discriminatoria por no ofrecer guías adecuadas. Rose v. Locke, 423 U.S. 48 (1975); Wainwright v. Stone, 414 U.S. 21 (1973). Véanse, además: 1 LaFave’s Criminal Law 4th Sec. 2.3, pág. 106 (2003); J.C. Jeffries, Legality, Vagueness, And The Construction Of Penal Statutes, 71 Va. L. Rev. 189, 207; L.E. Chiesa Aponte, Derecho Penal Sustantivo, San Juan, Pubs. J.T.S., 2007, pág. 17.
Analicemos en primera instancia la alegación sobre la “amplitud excesiva” de la disposición penal a la luz *379 de la doctrina de vaguedad. Art. 15.08(a) de la Ley Núm. 408, supra. Dicha disposición expone:
Sec. 6166g. — Penalidades
Toda persona que viole cualquiera de las disposiciones de [esta ley], incurrirá en delito menos grave y convicta que fuere, será sancionada con pena de una multa no mayor de cinco mil dó-lares ($5,000). 24 L.P.R.A. sec. 6166g.
Alega la peticionaria que la redacción de esta disposi-ción es excesivamente amplia, pues expresa que la viola-ción de cualquier disposición de la ley por toda persona equivale a una sanción penal, lo que no denota un juicio valorativo del legislador en cuanto a cuál es la conducta punible. Indica que la ley contiene más de doscientas dis-posiciones que van desde los derechos que le amparan a los pacientes de salud mental, hasta las obligaciones que la ley impone no sólo a los proveedores directos e indirectos de servicios de salud mental, sino a los mismos pacientes y familiares, en cuanto a la cooperación que se espera de éstos en todo tratamiento de un paciente de salud mental. Concluye que su aplicación literal podría crear absurdos, tales como el procesamiento penal de un paciente de salud mental por no cumplir con su obligación de “[a]sumir res-ponsabilidad sobre su recuperación en la medida de sus capacidades”.(4)
En primer lugar, por la ausencia de circunstancias es-peciales que lo permitan, en este caso a la peticionaria no le es permisible impugnar el estatuto, arguyendo escena-rios ajenos a su situación particular. Vélez v. Municipio de Toa Baja, supra; Vélez v. Srio. de Justicia, 115 D.P.R. 533, 541 (1984).(5) Teniendo presente lo anterior, aún queda ante nuestra consideración la pregunta que nos trae la pe- *380 ticionaria: ¿es válida una disposición legal que establece una sanción penal por la violación de cualquier otra dispo-sición de esa misma ley, sin que dicha disposición penal haga referencias a artículos específicos en la ley? Según las circunstancias particulares de este caso, contestamos en la afirmativa.
La importancia que la Asamblea Legislativa le imprimió a la prestación de servicios de salud mental en el país se tradujo en la imposición de sanciones penales a aquellas personas que violaran las disposiciones de la Ley de Salud Mental de Puerto Rico. Si bien es cierto que la manera como la Asamblea Legislativa esbozó su intención de pena-lizar las violaciones a la Ley de Salud Mental de Puerto Rico no es paradigma de buenas técnicas de redacción le-gislativa, no por eso debemos de claudicar a nuestro deber de interpretar razonablemente los estatutos de modo tal que se pueda hacer viable la intención del legislador. La disposición penal establecida en el Artículo 15.08(a) de la Ley de Salud Mental de Puerto Rico, supra, debe ser inter-pretada, no en el abstracto ni aisladamente, sino en con-junto con las demás disposiciones de dicha ley y de nuestro ordenamiento penal.
Como sabemos, el Artículo 9 del Código Penal de 1974,(6) 33 L.P.R.A see. 3041, definía delito como aquel “acto cometido u omitido en violación de alguna ley que lo prohíbe u ordena, aparejando, al ser probado, alguna pena o medida de seguridad”.(7) Por lo tanto, para que haya delito es necesario que exista, conforme al principio de legalidad, una ley que prohíba u ordene una acción. Esa acción o conducta debe ser adecuadamente definida en la ley, de modo tal que constituya la situación típica que de ser rea- *381 lizada, y de ser antijurídica y culpable, equivalga a la im-posición de una pena. Véase S. Mir Puig, Derecho Penal: Parte General, 7ma ed., Montevideo, Ed. B de F, 2005, pág. 145. Es claro, entonces, que la disposición penal que esta-blece la Ley de Salud Mental de Puerto Rico, la cual indica que la violación de cualquier disposición de la ley será pe-nable como delito menos grave, tiene necesariamente que referirse a las disposiciones de ley que claramente estable-cen actos que la ley prohíbe u ordena. Con sólo atender el Artículo 15.08(a), supra, no es suficiente para conocer la situación típica, puesto que este artículo sólo describe la pena aplicable. Es necesario considerar cada una de las disposiciones específicas de la ley para descubrir el su-puesto de hecho que de ser incumplido acarrea esa conse-cuencia jurídica.
Al imputársele a una persona la violación de cualquier disposición de esta ley, estará sujeta al análisis de los tribunales, en cuanto a si cumple con las exigencias requeri-das para la validez de estatutos penales.(8) Por lo tanto, la disposición penal incluida en el Artículo 15.08(a) de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. sec. 6166g(a), será válida en tanto la disposición específica que se impute violada establezca claramente una acción o conducta que la ley prohíba u ordene y, a su vez, cumpla con todos los re-quisitos necesarios para su validez.
Debemos entonces analizar el artículo imputado en este caso para auscultar si es excesivamente vago o si, por el contrario, establece claramente cuál es la conducta prohi-bida u ordenada.
C. El Artículo 3.06(a) establece:
El adulto que necesita, requiere y/o recibe servicios de salud mental será acreedor de los siguientes derechos específicos:
*382 (a) Acceso a servicios.-Todo adulto tendrá acceso a los servi-cios de salud mental, a tono con las subespecializaciones por etapa de vida, género, trastorno, edad y nivel de cuidado, a tenor con su diagnóstico y severidad de los síntomas y signos en el momento. Los servicios de tratamiento deben proveerse en un orden continuado según la severidad de los síntomas y signos, para lograr la recuperación en un nivel de funciona-miento razonable. A tales efectos, los adultos que reciben ser-vicios de salud mental no serán objeto de discrimen ni prejui-cio y tendrán acceso a dichos servicios, sin distinción del diagnóstico y severidad de su trastorno mental. Este derecho no podrá ser limitado por la existencia de alguna condición o impedimento físico. No existirá distinción entre un trastorno mental y cualquier otra condición médica en términos de ac-ceso de la persona a los servicios que necesite.

La utilización de los servicios de salud mental la determi-nará el equipo í nter o multidisciplinario, a base de la necesi-dad clínica justificada, la cual se fundamentará a su vez en el diagnóstico y en la severidad de los síntomas y signos del tras-torno mental, según se define en el manual de clasificación de trastornos que esté vigente al momento.

También tendrá derecho a recibir los servicios terapéuticos de farmacoterapia, psicoterapia, servicios de apoyo y otros congruentes con su diagnóstico y la severidad de los síntomas y signos a tenor con los parámetros clínicos óptimos.
Todo proveedor directo o indirecto de servicios de salud mental tendrá la obligación de brindar los servicios dentro de los primeros cinco (5) días naturales de la petición, siempre que el mismo no responda a una emergencia psiquiátrica. Se prohíbe que los proveedores de salud mental directo o indirecto tengan listas de espera para ofrecer los servicios a los solicitantes que excedan el límite de los cinco (5) días establecidos en este Artículo. (Énfasis suplido.) 24 L.P.R.A. sec. 6154e.
De la lectura de este artículo podemos colegir que establece varios derechos específicos relacionados con el acceso a los servicios de salud mental a favor de las personas que los solicitan. El artículo, además, establece una obligación a los proveedores directos e indirectos de servicios de salud mental de brindar dichos servicios en unos términos específicos contados a partir de la petición. Según un análisis de tipo objetivo, el sujeto activo del comporta- *383 miento es el proveedor directo o indirecto(9) de servicios de salud mental. El comportamiento o conducta punible es incumplir con la obligación creada por la ley de brindar los servicios de salud mental a los solicitantes que así lo re-quieran en los términos que allí se establecen.
El estatuto establece dos modalidades de delito codificadas en un mismo artículo, las cuales se distinguen por razón de si el solicitante de servicios de salud mental se encuentra en ese momento en una emergencia psiquiátrica. La ley define emergencia psiquiátrica como:
[E]l cuadro clínico caracterizado por una alteración en el pensamiento, en la percepción de la realidad, en los afectos o sentimientos, o en sus acciones o conducta que necesita una intervención terapéutica inmediata, o de urgencia ante la in-tensidad de los síntomas y signos, y por presentar riesgo in-mediato de daño a sí mismo, a otros o a la propiedad. (Énfasis suplido.) 24 L.P.R.A. sec. 6152b(q).
Así pues, las dos modalidades de delito son las siguien-tes: (1) la ley impone la obligación de brindar los servicios inmediatamente si estamos ante una emergencia psiquiá-trica o (2) en un término no mayor de cinco días naturales si el solicitante de servicios no se encuentra en una emer-gencia psiquiátrica. Es decir, en la primera de las modali-dades es necesario establecer que el solicitante se encon-traba en una emergencia psiquiátrica para que se active la obligación de brindar inmediatamente los servicios de sa-lud mental. La obligación de que los servicios se brinden de forma inmediata en dicha modalidad surge de la propia definición de emergencia psiquiátrica contenida en la ley. En la segunda de las modalidades se incurre en el delito si *384 no se ofrecen los servicios de salud mental en un período no mayor de cinco días naturales desde que se realiza la petición.
Somos del criterio que la obligación que impone la ley a los proveedores directos e indirectos de servicios de salud mental surge claramente del texto del Artículo 3.06(a), supra. La peticionaria argumenta que, aun cuando haya una obligación clara estatuida, la disposición sigue siendo vaga, porque no se define el término “servicios de salud mental”, por lo que no se conoce el contenido de esa obligación. Es necesario, entonces, interpretar el texto de la ley para determinar si establece en qué consisten los servicios de salud mental que serían ofrecidos en los térmi-nos mencionados.
En primer lugar, la peticionaria tiene razón al argumen-tar que la ley no incluye una definición de “servicios de salud mental”. No obstante, el mismo Artículo 3.06(a) es-tablece, en su segundo párrafo, que “[l]a utilización de los servicios de salud mental la determinará el equipo ínter o multidisciplinario, a base de la necesidad clínica justi-ficada”. Según la ley, los servicios de salud mental deberán ser aquellos que determine el equipo ínter(10) o multidisci-plinario(11) según las circunstancias de cada solicitante. El *385 Artículo 3.06(a) lo que ordena entonces es el comienzo de la prestación de los servicios de salud mental en los términos que allí se establecen, puesto que el contenido, intensidad y duración de éstos dependerán de los síntomas y signos de cada solicitante.
El Artículo 3.06(a) arroja luz sobre en cuál etapa co-mienza la prestación de los servicios de salud mental, ya que indica que los equipos ínter o multidisciplinario actua-rán según la necesidad clínica justificada de tratamiento. Por lo tanto, es necesario establecer primeramente cuál es la “necesidad clínica justificada” de cada solicitante para que el equipo, sea ínter o multidisciplinario, pueda ser in-tegrado y, a su vez, determinar la utilización de los servi-cios de salud mental individualmente. La ley define la ne-cesidad clínica justificada como:
“Necesidad clínica justificada de tratamiento”.-Determinación clínica que surge de la evaluación de la persona según los estándares aceptados por las distintas discipli-nas de salud mental como opción clínica de tratamiento, recuperado y rehabilitación por la severidad de los síntomas y signos, para detener el progreso de la enfermedad, mejorar la condición de la persona y mantenerlo a un nivel de funciona-miento socialmente aceptable, según la severidad de síntomas y signos. Esta determinación, consignada en el expediente clí-nico de la persona, va dirigida a informar y fundamentar la necesidad de iniciar o continuar con los servicios de salud mental. (Énfasis suplido.) 24 L.P.R.A. sec. 6152b(jj).
La necesidad clínica justificada es una determinación clínica que deberá surgir de la evaluación que se realice de la persona que solicita los servicios, según los estándares aceptados por las distintas disciplinas de la medicina rela- *386 cionadas con la salud mental. Surge claramente de dicha definición que es indispensable precisar la necesidad clí-nica justificada de tratamiento, puesto que esa determina-ción fundamentará la necesidad de iniciar o proseguir los servicios de salud mental. Esa determinación surgirá de la evaluación que se realice del solicitante. Una “evaluación” es, a su vez, definida en la ley como:
“Evaluación”.-Significa el procedimiento efectuado por un psiquiatra, psicólogo clínico, u otro profesional dentro de las profesiones relacionadas a la salud mental, con facultad para diagnosticar y prescribir tratamiento dentro de su profesión o especialidad, certificado con licencia para ejercer su profesión en Puerto Rico. Dicha evaluación será el producto de un exa-men clínico directo con instrumentos, de acuerdo al nivel de cuidado y al ambiente correspondiente, al momento de efec-tuar la misma, el cual contendrá hallazgos del historial, el estado emocional, mental y físico, al momento de llevarse a cabo, con impresiones diagnósticas, según aplique a la situa-ción en particular y con recomendaciones específicas sobre el manejo inmediato y pronóstico del paciente. 24 L.P.R.A. see. 6152b(x).
Una interpretación sistemática y razonable de las sec-ciones citadas establece que, antes de que el equipo ínter o multidisciplinario pueda determinar los servicios específi-cos que se les brindará a cada uno de los solicitantes, es necesario realizarles una evaluación a la luz de la cual se determinará la necesidad clínica justificada de trata-miento. Dicha evaluación deberá ser efectuada por un psi-quiatra, psicólogo clínico, u otro profesional de la salud mental “con facultad para diagnosticar y prescribir trata-miento dentro de su profesión o especialidad”, además de estar debidamente certificado. La evaluación consistirá en un “examen clínico con instrumentos” e incluirá, además, “hallazgos del historial, el estado emocional, mental y fí-sico, al momento de llevarse a cabo, impresiones diagnós-ticas ... y recomendaciones específicas sobre el manejo in-mediato y pronóstico del paciente”. 24 L.P.R.A. see. 6152b(x).
*387 Siendo esta evaluación el primer paso que debe cumplirse para que el equipo ínter o multidisciplinario pueda constituirse adecuadamente y, de justificarse, esta-blecer el plan de tratamiento individualizado para cada solicitante, es razonable entender que dicha evaluación es el servicio que debe prestarse inmediatamente si se está ante una emergencia psiquiátrica, o en un término no mayor de cinco días naturales desde la petición de servicios, si no estamos ante una emergencia psiquiátrica. Antes de que el equipo ínter o multidisciplinario establezca un plan de servicios de salud, debe determinarse la necesidad clí-nica justificada de forma tal que se fundamente la decisión de iniciar o no los servicios de salud mental. Dicha deter-minación surge de la evaluación que del solicitante sea realizada. Por lo tanto, los servicios de salud mental co-menzarán con la evaluación que se haga del solicitante, la que debe brindarse inmediatamente de estar ante una emergencia psiquiátrica o en un período corto no mayor de cinco días naturales desde la petición. Esta interpretación del texto de la ley es cónsona con la intención del legislador de que se comenzara la prestación de los servicios de salud mental lo más pronto posible y no se crearan listas de es-pera que sobrepasaran los cinco días naturales desde la petición.
En suma, el Artículo 3.06(a) impone una clara obliga-ción a los proveedores directos e indirectos de servicios de salud mental de proveer dichos servicios en unos términos específicos. De estar el paciente en una emergencia psi-quiátrica, deberán brindar dichos servicios inmediata-mente. De no estarlo, deberán prestarlos en un término no mayor de cinco días desde la petición. De una interpreta-ción sistemática razonable basada en el texto de la ley, con-cluimos que los servicios a los que se refiere el Artículo 3.06(a) es la evaluación que de todo solicitante deben rea-lizar los proveedores directos o indirectos para determinar la necesidad clínica justificada. Dicha evaluación debe cumplir con los requisitos establecidos por ley.
*388 Es forzoso concluir, entonces, que el Artículo 3.06(a) no es vago. El estatuto establece adecuadamente cuál es la conducta ordenada. El contenido de la obligación es fácilmente discernible, luego de interpretar razonablemente la disposición en cuestión. Como establecimos, el hecho de que una disposición requiera interpretación no significa que es vaga, puesto que “no debe caerse en la superficialidad de creer que una ley penal es nula por defecto de vaguedad debido a que requiera interpretación”. Pueblo v. Tribunal Superior, 81 D.P.R. 763, 788 (1960). Véase, además, Pueblo v. Tribunal Superior, 98 D.P.R. 750, 751 (1970); Vives Vázquez v. Tribunal Superior, supra, pág. 145. Al interpretar la ley tomamos en cuenta los fines que ésta persigue y la política pública que la inspira, considerando las consecuencias que conlleva la interpretación. Véase Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 409 (1988).
Por otro lado, la ley no se presta para una aplicación arbitraria y discriminatoria, puesto que provee criterios adecuados que rigen la discreción de aquellos llama-dos a aplicarla. Véase In re Guzmán Géigel, 113 D.P.R. 122, 129 (1982). No nos convence el argumento de la peticionaria de que se demuestra la arbitrariedad de la ley cuando el Ministerio Público, sólo la acusó a ella y no a otras personas que entiende podrían ser acusadas. La amplia discreción que hemos reconocido en la persona del Secretario del Departamento de Justicia de Puerto Rico y de los fiscales bajo su supervisión para el procesamiento de delitos, es un asunto distinto al análisis de si una ley carece de criterios adecuados para regir la discreción de aquellos que la aplican, de modo que la ley sea vaga. Véase Pueblo v. Martínez Acosta, 174 D.P.R. 275 (2008); Pueblo v. Dávila Delgado, 143 D.P.R. 157, 170 (1997). Los tribunales no deben intervenir en la discreción del Ministerio Público de acusar o no a una persona por determinado delito, salvo abuso de discreción por procesamiento selectivo fundamentado en *389 consideraciones constitucionalmente inaceptables, lo que en este caso no ha sido demostrado. Pueblo v. Martínez Acosta, supra.
Tampoco en este caso se viola el principio de legalidad que rige en nuestro ordenamiento,(12) pues la interpreta-ción que del artículo imputado hacemos se fundamenta en su texto, sin acudir a fuentes externas para suplir por vía judicial lo que el legislador dejó de plasmar en el texto de la ley. Cf. Pueblo v. Martínez Yanzanis, 142 D.P.R. 871 (1997). Así pues, siendo en este caso el Artículo 3.06(a) de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. see. 6154(a), una disposición clara en cuanto a las obligaciones que impone a los proveedores directos o indirectos de ser-vicios de salud mental, es válida y aplicable la disposición penal estatuida en el Artículo 15.08(a) de dicha ley, supra, que castiga su violación con pena de multa no mayor de cinco mil dólares. El hecho de que el Artículo 3.06(a), supra, provee un aviso adecuado de cuál es la conducta pro-hibida, dispone también del segundo argumento de la pe-ticionaria en cuanto a que la ley creaba un efecto neutralizador o “chilling effect” sobre la práctica de los pro-fesionales de la salud, debido a que alegadamente no se sabía cuál era la conducta prohibida, pues hemos llegado a un resultado contrario.
III
En el tercer error apuntado, la peticionaria APS indica que debe desestimarse la denuncia en su contra, ya que a la Sra. Sonia Torres Ríos no se le encontró causa para el arresto, por lo que procede que la corporación APS *390 Healthcare, Inc. corra igual suerte, ya que ésta obró a tra-vés de la señora Torres. El planteamiento carece de méritos. En primer lugar, el Código Penal de 1974 estable-cía que las personas jurídicas serían penalmente responsa-bles “cuando a través de personas autorizadas en realiza-ción de sus acuerdos y en representación de las mismas, o cuando realicen actuaciones que le sean atribuibles, come-tan hechos delictuosos”. Art. 37 del Código Penal de 1974 (33 L.P.R.A. see. 3174). El mismo artículo establecía que dicha responsabilidad no excluía la individual en que pu-dieran incurrir los dirigentes o representantes de éstas. Id. Como bien apuntó al comentar este artículo la profesora Nevares-Muñiz, la responsabilidad de los representantes es individual y separada de la que pueda tener la corpora-ción como persona jurídica. Véase D. Nevares-Muñiz, Có-digo Penal de Puerto Rico, revisado y comentado, 6ta ed., San Juan, Ed. Inst. Desarrollo del Derecho, 2000, pág. 74. Por esto, no podemos atribuirle un efecto de cosa juzgada o de impedimento colateral por sentencia a una determina-ción de “no causa” para el arresto contra un representante de la corporación, para evitar el procesamiento de la corpo-ración por los mismos hechos.
Por otro lado, estamos ante un delito que se comete por omisión, es decir, por un no obrar conforme a una obliga-ción establecida cuando la ley así lo ordena. En este tipo de delito, las personas jurídicas responden penalmente cuando aquellos llamados a actuar por ésta no actuaron conforme a la ley. Así pues, en este caso se le denunció a la peticionaria, no por los actos realizados por la señora Torres en su carácter personal, sino por los que debió haber hecho la corporación a través de cualquiera de sus repre-sentantes y alegadamente no hizo. La determinación de “no causa” contra la señora Torres en nada afecta la deter-minación de causa contra la peticionaria APS, pues ésta pudo haber actuado a través de otras personas, no exclusi-vamente la señora Torres.
*391 IV
En el cuarto y último error apuntado, la peticionaria APS indica que no se le encontró causa para el arresto conforme a derecho, por no haberse presentado prueba de todos los elementos del delito, por lo que solicita la deses-timación de la denuncia según la Regla 64(p) de Procedi-miento Criminal, 4 L.P.R.A. Ap. II.
A. En un procedimiento de determinación de causa probable para el arresto es necesario que el Ministerio Pú-blico presente prueba sobre todos los elementos del delito imputado, de modo tal que el magistrado pueda determi-nar que se ha cometido el delito y la conexión de éste con el imputado. Regla 6(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II; Pueblo v. Jiménez Cruz, 145 D.P.R. 803, 813 (1998). Esta prueba debe ser legalmente admisible en un juicio plenario. Pueblo v. Andaluz Méndez, 143 D.P.R. 656, 662 (1997). El estándar al atender una moción al am-paro de la Regla 64(p), cuando se alegue insuficiencia de prueba en la vista de determinación de causa para el arresto, será el de ausencia total de prueba del delito imputado. Pueblo v. Rivera Alicea, 125 D.P.R. 37, 42 (1989).
Como establecimos, el delito estatuido en el Artículo 3.06(a) de la Ley de Salud Mental de Puerto Rico, supra, contiene dos modalidades. En la primera se comete el de-lito al negar o no ofrecer los servicios de salud mental in-mediatamente a una persona que sufra de urna emergencia psiquiátrica. Esto es, penaliza el que no se realice la eva-luación del solicitante inmediatamente, según los criterios de la ley. Por lo tanto, los elementos de dicha modalidad son: (1) que un solicitante adulto haya requerido servicios de salud mental a un proveedor directo o indirecto, (2) que el solicitante se encontraba en una emergencia psiquiá-trica y (3) que el proveedor directo o indirecto no le brindó *392 la evaluación requerida inmediatamente. En esta primera modalidad es un elemento esencial del delito el estado de emergencia psiquiátrica del solicitante, conforme a la defi-nición incluida en la propia ley. En cuanto a la segunda modalidad, los elementos son: (1) que una persona adulta haya solicitado servicios de salud mental a un proveedor directo o indirecto y (2) que el proveedor directo o indirecto no le brindó la evaluación requerida en un período no mayor de cinco días naturales desde la petición.
En cuanto al elemento subjetivo necesario para configu-rarse este delito, debemos revisar primeramente el es-quema regulador de los elementos mentales o subjetivos que regía según el Código Penal de 1974. El Artículo 14 del Código Penal de 1974 indicaba:
Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal.
La intención o negligencia se manifiestan por las circuns-tancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona. 33 L.P.R.A. see. 3061.
A diferencia del Código Penal de 2004, el Código Penal de 1974 establecía un sistema abierto a la negligencia. Chiesa Aponte, op. cit., pág. 141. Esto es, en principio los delitos podían ser castigados tanto por intención como por negligencia, independientemente de si el tipo permitía ex-presamente que se castigara por negligencia. Para deter-minar cuál era el elemento subjetivo necesario para cada delito, había que acudir al texto del tipo para saber si se desprendía de éste un estado mental necesario para la co-misión del delito. Véase E.L. y L.E. Chiesa Aponte, Derecho Penal, 73 Rev. Jur. U.P.R. 671, 685 (2004). Frases y pala-bras como: “a sabiendas”, “fraudulentamente”, “con malicia premeditada”, “ilegalmente”, “voluntariamente”, “delibera-damente” y “con el propósito de”, entre otras, denotan el *393 requerimiento del legislador del elemento subjetivo de intención. A falta de este tipo de lenguaje, según el Artículo 14, el delito podía ser cometido con sólo mediar negligencia.
Según el Código Penal de 1974, respondía por negligen-cia la persona que producía un resultado delictuoso sin quererlo, por imprudencia o descuido, falta de circunspec-ción o impericia, o por inobservancia de la ley. Art. 16 del Código Penal de 1974 (33 L.P.R.A. see. 3063). Fundamen-tado en esta definición fue que establecimos que la negli-gencia en nuestro sistema se manifiesta en cuatro modali-dades: imprudencia, descuido, impericia e inobservancia de reglamentos y leyes. Pueblo v. Ruiz Ramos, 125 D.P.R. 365, 386 (1990). Claro está, el grado de negligencia nece-sario para la comisión de un delito es mayor que aquel exigido para imponer responsabilidad según el Artículo 1802 del Código Civil, 31 L.P.R.A. see. 5141, puesto que se requiere una desviación crasa del estándar de cuidado que se espera de una persona prudente y razonable mediante las mismas circunstancias. Pueblo v. Ruiz Ramos, supra, pág. 384.
Los Artículos 3.06(a) y 15.08(a) de la Ley de Salud Mental de Puerto Rico no hacen referencia al elemento subje-tivo específico y necesario para configurar la omisión anti-jurídica, por lo que, en principio, el delito puede ser cometido a base de negligencia. Cabe, entonces, preguntar-nos: ¿es posible cometer un delito de omisión pura o propia a base de negligencia? La respuesta es sí. La omisión ha sido definida por cierto autor como “la imputación a la con-ducta del sujeto de la no realización de una prestación po-sitiva estimada ex ante como necesaria para la salva-guarda de un bien jurídico”. J.M. Silva Sánchez, Delito de omisión: concepto y sistema, Barcelona, Ed. Bosch, 1986, pág. 158. En ese sentido, la conducta que ha realizado el sujeto podría ser voluntaria y querida o, aún sin ser que-rida, previsible de que con dicha conducta no realizaría la *394 prestación que el ordenamiento le exige, lo que configura-ría el delito por omisión de manera dolosa o intencional. Por otro lado, la conducta que realiza el sujeto podría ser realizada por imprudencia o descuido, o falta de circuns-pección o impericia, o por inobservancia de la ley de ma-nera tal que dicha conducta equivalga a la no realización de la prestación que el tipo le exige realizar, configurán-dose de esta manera el delito por omisión negligente o imprudente.
Somos del criterio que el delito estatuido en el Artículo 3.06(a), supra, es posible cometerlo tanto por intención como por negligencia.(13) En su modalidad negligente, po-dría ocurrir que un proveedor de servicios directo o indi-recto, por simple inobservancia de la ley, no brindara la evaluación en los términos requeridos y, en su lugar, enlis-tara al paciente para ofrecerle los servicios fuera de los plazos establecidos, en contravención de la ley. O podría darse el caso que, aun cuando se brindara la evaluación en los términos establecidos, ésta no cumpliera con los requi-sitos exigidos por el tipo a través de la definición de “eva-luación” incluida en la ley, de modo tal que la acción reali-zada se desviara crasamente de la prestación exigida.
Teniendo los elementos que configuran el delito esta-tuido en el Artículo 3.06(a), supra, examinemos la prueba que se presentó en el procedimiento de causa para el arresto.
B. En la vista de causa probable para el arresto me-diante la Regla 6 de Procedimiento Criminal, testificaron la madre del occiso, la Sra. Nancy Meléndez González, y el Dr. Enrique Rivera Mass. Además, como prueba documen-tal, se presentó el Informe de Médico Forense, el cual de- *395 terminó que la causa de la muerte del señor Rosario Me-léndez fue suicidio por asfixia.
La señora Meléndez González testificó que el 11 de fe-brero de 2005 acudió al Hospital Regional de Bayamón a solicitar servicios de salud mental para su hijo. En el Hospital le informaron que no podían atender al señor Rosario Meléndez, pues éste contaba con veintidós años de edad y allí sólo atendían a jóvenes adolescentes. Fue referida a la clínica operada por la peticionaria APS en el pueblo de Bayamón. Indicó que allí solicitó servicios de salud mental para la condición de su hijo. Testificó, además, que en la clínica su hijo fue atendido por la señora Torres, quien le informó que el señor Rosario Meléndez no presentaba nin-guna situación de emergencia en ese momento y que en caso de emergencia llamara a los números que se incluían en la tarjeta de APS que ésta tenía. Por último, declaró que la señora Torres refirió a su hijo a dos citas: una con un consejero de adicciones y una con un psiquiatra, las cuales se llevarían a cabo el 24 de febrero de 2005 y el 3 de marzo de 2005, respectivamente.
Por otro lado, surge de los autos que el doctor Rivera Mass testificó acerca de una investigación que éste realizó en relación con los sucesos de este caso, para lo cual pre-paró un informe a la Administración de Servicios de Salud Mental y Contra la Adicción (ASSMCA).(14) El testimonio del doctor Rivera Mass lo que hace es corroborar el relato de hechos en cuanto a que la señora Meléndez fue con su hijo en primer lugar al Hospital Regional de Bayamón a solicitar los servicios de salud mental, y al decirle en este centro que sólo atendían a adolescentes, fueron entonces referidos a la clínica de la peticionaria APS, donde Rosario Meléndez fue atendido por la señora Torres. A esto sólo añade que la evaluación dada por la señora Torres al joven *396 Rosario Meléndez fue deficiente y que, en su opinión, éste requería una evaluación psiquiátrica.
En la denuncia enmendada presentada contra la peti-cionaria, se le imputaron ambas modalidades del delito es-tatuido en el Artículo 3.06(a). Sin embargo, en cuanto a la modalidad de emergencia psiquiátrica, no logramos encon-trar un ápice de prueba que haya presentado el Ministerio Público en cuanto al cuadro clínico que presentaba el joven Rosario Meléndez al llegar a la clínica de la peticionaria, de modo tal que el juzgador de Regla 6, supra, pudiese determinar que probablemente el joven se encontraba en ese momento en una emergencia psiquiátrica. El testimo-nio del doctor Rivera Mass sólo indica, según establecido por el Ministerio Público en uno de sus alegatos, que en su opinión este joven requería una evaluación psiquiátrica, pero eso no equivale a que éste se encontraba en una emer-gencia psiquiátrica. El término “emergencia psiquiátrica” es un concepto médico que, aunque no resolvemos que re-quiera prueba pericial para ser probado, ciertamente re-quiere prueba testifical o documental que establezca, para propósitos de urna determinación de causa probable para el arresto, que probablemente una persona presentaba un cuadro clínico que reflejaba una alteración en sus acciones o conducta que requería intervención terapéutica inme-diata, según lo exige la definición de dicho concepto en la ley. No surgiendo de los autos este tipo de prueba, estamos ante un caso de ausencia total de prueba de un elemento esencial del delito por lo que el juzgador de Regla 6, no podía encontrar causa probable para arresto con arreglo a derecho por esa modalidad.
Esta conclusión, sin embargo, no dispone del caso ante nuestra consideración. Sabido es que un juez en un proce-dimiento de causa probable para el arresto o para acusar puede encontrar causa probable por el delito que la prueba sustente y no necesariamente por el imputado. Pueblo v. Torres, Esparra, 132 D.P.R. 77, 86 (1992); Regla 6(c) de *397 Procedimiento Criminal, 34 L.P.R.A. Ap. II. En este caso se presentó una prueba de que el joven Rosario Meléndez so-licitó los servicios de salud mental y que la evaluación re-querida no se le proporcionó en un período no mayor de cinco días, o al menos, la realizada por la señora Torres fue deficiente. Esto constituye prueba suficiente en esta etapa para configurar la segunda modalidad del delito codificado en el Artículo 3.06(a) de la Ley de Salud Mental de Puerto Rico, ya que se presentó alguna prueba de todos los ele-mentos del delito, incluso del elemento subjetivo necesario. En cuanto a esa modalidad, no estamos ante un caso de ausencia total de prueba, por lo que no procede la desesti-mación de la denuncia, sino la celebración de un juicio ple-nario contra la peticionaria APS.
V
En suma, somos del criterio que ninguno de los cuatro errores delineados por la peticionaria fueron cometidos.
Por los fundamentos expuestos, se modifica la sentencia del Tribunal de Apelaciones y se envía el caso al Tribunal de Primera Instancia para que se celebre el juicio corres-pondiente bajo la segunda modalidad del Artículo 3.06(a) de la Ley de Salud Mental de Puerto Rico.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Rivera Pérez concurrió con el resultado sin opinión escrita.

O El Tribunal de Primera Instancia autorizó la enmienda a la denuncia, la cual fue objetada por la peticionaria el 2 de abril de 2006. La denuncia original exponía:
“El referido acusado APS Healthcare [P.R. Inc.] allá en o para el 10 al 11 de febrero de 2005, en Bayamón, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Bayamón, ilegalmente, violó la disposición del Art. 3.06 de la Ley 408 al negar acceso a un servicio de emergencia psiqui[á]trica a Marcos Rosario Meléndez quien tenía derecho a ello por su condición de salud mental y porque era de conocimiento del acusado a través de sus funcionarios de las ideas de daño a si (sic) mismo suicidas que manifestaba por Marcos Rosario Meléndez. Ocu-rriendo la muerte de Marcos Rosario Meléndez por suicidio el 18 de febrero de 2005”. Apéndice de la Petición de certiorari, pág. 101.
La peticionaria ha hecho expresa y formal reserva de derechos sobre cualquier reclamo de prescripción que pudiese levantar y así lo hemos entendido al momento de evaluar y resolver los méritos del recurso, por lo que no nos expresamos en cuanto a dicho planteamiento.

 Tomamos conocimiento de la existencia de una controversia en cuanto al verdadero patrono de la Sra. Sonia Torres Ríos, si es APS Healthcare of Puerto Rico Inc. o APS Clinics of Puerto Rico Inc. El Tribunal de Primera Instancia, no obstante, encontró prueba suficiente en esta etapa de los procedimientos para creer que la señora Torres era representante de APS Healthcare of Puerto Rico Inc. De todos modos, la controversia no fue traída ante este Foro.

 Sentencia del Tribunal de Apelaciones, pág. 16. Apéndice de la Petición de certiorari, pág. 18.

 Art. 3.06(t)(1) de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A sec. 6154e(t)(1).

 Es decir, en este caso sólo estamos pasando juicio sobre la validez de las disposiciones penales de la Ley de Salud Mental de Puerto Rico a la luz de la situa-ción particular que nos trae la peticionaria.

 Los hechos de este caso ocurrieron antes de la vigencia del Nuevo Código Penal de 2004, por lo que las disposiciones aplicables son aquellas del Código Penal de 1974. Pueblo v. González, 165 D.P.R. 675 (2005).

 Idéntica definición tiene en el Código Penal de 2004. Véase Art. 15 del Código Penal de 2004 (33 L.P.R.A. see. 4643).

 Esto es, deberá cumplir con las exigencias del principio de legalidad, la teoría del delito, además de estar sujeta al análisis constitucional correspondiente a la limitación del poder punitivo o de criminalización del Estado. Véase L.E. Chiesa Aponte, Derecho Penal Sustitutivo, San Juan Pubs. J.T.S., 2007, págs. 38-41.

 La ley define “Proveedor indirecto de servicios de salud” como “todo asegu-rador u organización de servicios de salud pública o privada, debidamente autori-zada en Puerto Rico a ofrecer, o que se obligue [a] proveer servicios de salud según dispuesto en [la Ley Núm. 77 de 19 de junio de 1957, según enmendada,] conocid[a] como ‘Código de Seguros de Puerto Rico’, así como planes organizados y autorizados por alguna ley especial”. Art. 1.06(uu) de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. sec. 6152b(uu).

 La ley define “equipo interdiseiplinario” como “el equipo compuesto por tres (3) o más profesionales de la salud mental de diferentes disciplinas, los cuales pro-veen servicios de salud mental con capacidad, facultad profesional y legal para diag-nosticar y prescribir tratamiento en las diferentes áreas del funcionamiento y las capacidades del ser humano, y por aquellos otros profesionales pertinentes a la con-dición de la persona, trabajando todos en un mismo escenario. El equipo interdisci-plinario se distingue por un trabajo en equipo y en consenso, el cual se caracteriza por una interacción de todos los profesionales con el paciente en tratamiento, una discusión de casos, de conocimiento pleno de las contribuciones de cada profesión o disciplina, y de las mejores prácticas en el campo, para la recuperación de la persona. La composición del equipo y el liderazgo del mismo, variará de acuerdo al escenario o servicio a ser prestado y a las necesidades clínicas de la persona”. Art. 1.06(u) de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. sec. 6152b(u).

 La ley define “equipo multidisciplinario” como “el grupo de trabajo com-puesto por tres (3) o más profesionales de la salud mental de diferentes disciplinas, las cuales proveen servicios de salud mental con capacidad, facultad profesional y legal para diagnosticar y prescribir tratamiento en las diferentes áreas del funciona-miento y las capacidades del ser humano, y por aquellos otros profesionales perti-nente a la condición de la persona, relacionados en un mismo escenario. Atienden a *385 una misma población, dentro de una misma categoría para el desarrollo del trata-miento, recuperación y rehabilitación, para el mejor funcionamiento de la persona, de acuerdo a su situación y diagnóstico. Este equipo trabaja en consulta, y se puede comunicar por medio del expediente clínico y discusión de casos. Una institución proveedora podrá hacer uso de este equipo, cuando por alguna razón no pueda desa-rrollar un equipo interdisciplinario para diagnosticar y prescribir el tratamiento correspondiente”. Véase Art. 1.06(v) de la Ley de Salud Mental de Puerto Rico, 24 L.P.R.A. sec. 6152b(v).

 “No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido. No se podrán crear por analogía delitos, penas, ni medidas de seguridad”. Art. 8 del Código Penal de 1974 (33 L.P.R.A. see. 3031).

 Esto es aplicable a violaciones del artículo estudiado, anteriores a la vigen-cia del Código Penal de 2004; para hechos acaecidos a partir de la vigencia de dicho Código, el delito sólo puede ser cometido a base de intención por no haber alusión expresa a la negligencia en el tipo. Véase el Art. 22 del Código Penal de Puerto Rico, 33 L.P.R.A. see. 4650.

 A diferencia del testimonio de la señora Meléndez González, para el cual contamos con el beneficio de una transcripción, el testimonio del doctor Rivera Mass surge de los alegatos presentados por las partes. Aún así, no parece haber controver-sia entre las partes en cuanto al contenido de lo testificado por éste.